**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JAMES DWIGHT PAVATT,

      Petitioner - Appellant,

v.

MIKE CARPENTER, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee.

No. 14-6117

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:08-CV-00470-R)**
_____

Sarah M. Jernigan (Patti Palmer Ghezzi, with her on the briefs), Assistant Federal Public Defenders, Office of the Federal Public Defender for the Western District of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellant.

Jennifer L. Crabb, Assistant Attorney General (Mike Hunter, Attorney General, with her on the briefs), Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, appearing for Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **KELLY**, **BRISCOE**, **LUCERO**, **HARTZ**, **HOLMES**, **MATHESON**, **BACHARACH**, **PHILLIPS**, **McHUGH**, **MORITZ**, **EID**, and **CARSON**, Circuit Judges.
_____

**BRISCOE**, Circuit Judge.
_____

Petitioner James Pavatt was convicted by an Oklahoma jury of first degree murder and conspiracy to commit first degree murder. Pavatt was sentenced to death for the first degree murder conviction and ten years' imprisonment for the conspiracy conviction. After exhausting his state court remedies, Pavatt filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Pavatt's petition, and also denied Pavatt a certificate of appealability (COA). Pavatt sought and was granted a COA by this court with respect to five issues.

The original hearing panel affirmed the district court's denial of relief with respect to Pavatt's convictions, but in a divided decision reversed the denial of relief with respect to Pavatt's death sentence and remanded to the district court for further proceedings. In doing so, the panel majority concluded that the Oklahoma Court of Criminal Appeals (OCCA) "did not apply a constitutionally acceptable interpretation of Oklahoma's [especially heinous, atrocious, or cruel (HAC)] aggravator in determining [on direct appeal] that the aggravator was supported by sufficient evidence." Pavatt v. Royal, 894 F.3d 1115, 1132 (10th Cir. 2017) (Pavatt Federal Appeal).[1]

---

[1] The original panel decision issued on June 9, 2017. Pavatt v. Royal, 859 F.3d 920 (10th Cir. 2017). Later, a majority of the panel members denied panel rehearing, but filed an amended decision *sua sponte* and *nunc pro tunc* to the original filing date. Pavatt Federal Appeal (894 F.3d 1115). In an order dated October 2, 2018, the respondent's petition for rehearing *en banc* was granted. Pavatt v. Carpenter, 904 F.3d 1195 (10th Cir. 2018). The grant of *en banc* rehearing vacated the original judgment and stayed the mandate. 10th Cir. R. 35.6.

Respondent filed a petition for rehearing *en banc*.[2] We granted respondent's petition and directed the parties to file supplemental briefs addressing a number of questions concerning Pavatt's challenges to the HAC aggravator. Having received those briefs and after additional oral arguments addressing those questions, we conclude that Pavatt's Eighth Amendment "as-applied" challenge to the HAC aggravator—the issue that the original panel majority relied on in granting him relief—is, for a number of reasons, procedurally barred. We also conclude that the other issues raised by Pavatt on appeal lack merit. Consequently, we vacate the prior panel opinion and affirm the district court's denial of federal habeas relief with respect to both Pavatt's convictions and death sentence. We also deny Pavatt's request for an additional COA.

# I

## *Factual background*

The background facts of Pavatt's crimes were outlined by the OCCA in resolving Pavatt's direct appeal:

> [Pavatt] and his co-defendant, Brenda Andrew, were each charged with conspiracy and first-degree capital murder following the shooting death of Brenda's husband, Robert ("Rob") Andrew, at the Andrews' Oklahoma City home on November 20, 2001. [Pavatt] met the Andrews while attending the same church, and [Pavatt] and Brenda taught a Sunday school class together. [Pavatt] socialized with the Andrews and their two young children in mid–2001, but eventually began having a sexual relationship with Brenda. Around the same time, [Pavatt], a life insurance agent, assisted Rob Andrew in setting up a life insurance policy worth approximately $800,000. [Pavatt] divorced his wife in the summer of 2001.

---

[2] We note that Pavatt did not seek rehearing of the original panel's unanimous affirmance of his convictions.

3

In late September, Rob Andrew moved out of the family home, and Brenda Andrew initiated divorce proceedings a short time later.

Janna Larson, [Pavatt]'s adult daughter, testified that in late October 2001, [Pavatt] told her that Brenda had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone severed the brake lines on Rob Andrew's automobile. The next morning, [Pavatt] and Brenda Andrew concocted a false "emergency," apparently in hopes that Rob would have a traffic accident in the process. [Pavatt] persuaded his daughter to call Rob Andrew from an untraceable phone and claim that Brenda was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. The plan failed; Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police.

One contentious issue in the Andrews' divorce was control over the insurance policy on Rob Andrew's life. After his brake lines were severed, Rob Andrew inquired about removing Brenda as beneficiary of his life insurance policy. However, [Pavatt], who had set up the policy, learned of Rob's intentions and told Rob (falsely) that he had no control over the policy because Brenda was the owner. Rob Andrew spoke with [Pavatt]'s supervisor, who assured him that he was still the record owner of the policy. Rob Andrew then related his suspicions about [Pavatt] and Brenda to the supervisor. When [Pavatt] learned of this, he became very angry and threatened to harm Rob for putting his job in jeopardy. At trial, the State presented evidence that in the months preceding the murder, [Pavatt] and Brenda actually attempted to transfer ownership of the insurance policy to Brenda without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.

On the evening of November 20, 2001, Rob Andrew drove to the family home to pick up his children for a scheduled visitation over the Thanksgiving holiday. He spoke with a friend on his cell phone as he waited in his car for Brenda to open the garage door. When she did, Rob ended the call and went inside to get his children. A short time later, neighbors heard gunshots. Brenda Andrew called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. Brenda Andrew had also suffered

4

a superficial gunshot wound to her arm. The Andrew children were not, in fact, packed and ready to leave when Rob Andrew arrived; they were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

Brenda was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down. One witness saw Brenda chatting giddily with [Pavatt] at the hospital later that night.

Rob Andrew was shot twice with a shotgun. A spent shotgun shell found in the garage fit a 16–gauge shotgun, which is a rather unusual gauge. Andrew owned a 16–gauge shotgun, but had told several friends that Brenda refused to let him take it from the home when they separated. Rob Andrew's shotgun was missing from the home when police searched it. One witness testified to seeing Brenda Andrew engaging in target practice at her family's rural Garfield County home about a week before the murder. Several 16–gauge shotgun shells were found at the site.

Brenda told police that her husband was attacked in the garage by two armed, masked men, dressed in black, but gave few other details. Brenda's superficial wound was caused by a .22–caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance as she ran from the garage into the house. About a week before the murder, [Pavatt] purchased a .22–caliber handgun from a local gun shop. On the day of the murder, [Pavatt] borrowed his daughter's car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but his daughter found a .22–caliber bullet on the floorboard. In a conversation later that day, [Pavatt] told Larson never to repeat that Brenda had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the bullet she had found in her car.

Police also searched the home of Dean Gigstad, the Andrews' next-door neighbor. There they found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16–gauge shotgun shell was found on the bedroom floor, and several .22–caliber bullets were found in the attic itself. There were no signs of forced entry into the Gigstads' home. Gigstad and his wife were out of town when the murder took place, but Brenda Andrew had a key to their home. The .22–caliber bullet found in Janna Larson's car was of the same brand as the

5

three .22–caliber bullets found in the Gigstads' attic; the .22–caliber bullet fired at Brenda and retrieved from the Andrews' garage appeared consistent with them in several respects. These bullets were capable of being fired from the firearm that [Pavatt] purchased a few weeks before the murder; further testing was not possible because that gun was never found. The shotgun shell found in the Gigstads' home was of the same brand and odd gauge as the 16–gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was impossible to confirm because, as noted, that gun also turned up missing.

In the days following the murder, [Pavatt] registered his daughter as a signatory on his checking account, and asked her to move his belongings out of his apartment. He obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after the murder, Brenda and [Pavatt] asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for the Andrew children to travel with Brenda out of the country. Brenda also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson could wire them money after they left town.

Brenda Andrew did not attend her husband's funeral. Instead, she and [Pavatt] drove to Mexico, and took the Andrew children with them. [Pavatt] called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down [Pavatt] and Brenda. In late February 2002, having run out of money, [Pavatt] and Brenda Andrew re-entered the United States at the Mexican border. They were promptly placed under arrest.

Pavatt v. State, 159 P.3d 272, 276-78 (Okla. Crim. App. 2007) (paragraph numbers and footnotes omitted) (Pavatt I).

*State trial proceedings*

On November 29, 2001, the State of Oklahoma filed an information in the District Court of Oklahoma County charging Pavatt and Brenda Andrew jointly with first degree murder. An amended information was filed on July 19, 2002, charging Pavatt and

6

Brenda Andrew with one count of first degree murder and one count of conspiracy to commit first degree murder. At that same time, the State filed a bill of particulars alleging the existence of three aggravating circumstances: (1) that Pavatt committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration; (2) the murder `was especially heinous, atrocious, or cruel; and (3) the existence of a probability that Pavatt would commit criminal acts of violence that would constitute a continuing threat to society.

The case against Pavatt proceeded to trial on August 25, 2003.[3] At the conclusion of the first-stage evidence, the jury found Pavatt guilty of both counts charged in the amended information. At the conclusion of the second-stage evidence, the jury found the existence of two aggravating circumstances: (1) that Pavatt committed the murder, or employed another to commit the murder, for remuneration or the promise thereof; and (2) that the murder was especially heinous, atrocious, or cruel. The jury also found that these aggravating circumstances outweighed the mitigating circumstances and it recommended that Pavatt be sentenced to death for the first degree murder conviction.

Pavatt was sentenced in accordance with the jury's recommendations on each count of conviction.

---

[3] Brenda Andrew was tried separately, convicted of both counts, and sentenced to death. Her federal habeas appeal is currently pending in this court.

*Pavatt's direct appeal*

Pavatt filed a direct appeal asserting eighteen propositions of error. The OCCA rejected all of Pavatt's propositions of error and affirmed his convictions and sentences. Pavatt I, 159 P.3d at 297. Pavatt filed a petition for rehearing, which was denied by the OCCA.

Pavatt filed a petition for writ of certiorari with the United States Supreme Court. The Supreme Court denied Pavatt's petition on February 19, 2008. Pavatt v. Oklahoma, 552 U.S. 1181 (2008).

*Pavatt's application for post-conviction relief*

On April 17, 2006, Pavatt filed with the OCCA an application for post-conviction relief asserting three propositions of error. Approximately two years later, on April 11, 2008, the OCCA issued an unpublished opinion denying Pavatt's application. Pavatt v. State, No. PCD-2004-25 (Okla. Crim. App. Apr. 11, 2008) (Pavatt II).

*The filing of Pavatt's federal habeas petition*

Pavatt initiated these federal habeas proceedings on May 5, 2008, by filing a motion for appointment of counsel. The district court granted that motion and appointed counsel to represent Pavatt. On April 1, 2009, Pavatt's appointed counsel filed a petition for writ of habeas corpus asserting fifteen grounds for relief. In his petition, Pavatt conceded that certain of the claims asserted therein were "newly developed" and "m[ight] require further exhaustion." ROA, Vol. 1 at 243 (Dist. Ct. Docket No. 42 at 213). As a result, Pavatt requested that his petition "be held in abeyance so that he [could] return to

state court to accomplish any necessary exhaustion." Id. At no point, however, did the district court stay the case or otherwise hold it in abeyance to allow Pavatt to exhaust his state court remedies.

*Pavatt's second application for post-conviction relief*

On September 2, 2009, while his federal habeas petition was pending in federal district court, Pavatt filed with the OCCA a second application for post-conviction relief asserting six propositions of error. On February 2, 2010, the OCCA issued an unpublished opinion denying Pavatt's second application. Pavatt v. State, No. PCD-2009-777 (Okla. Crim. App. Feb. 2, 2010) (Pavatt III).

*The denial of Pavatt's federal habeas petition and the instant appeal*

On May 1, 2014, the district court issued an order denying Pavatt's petition. On that same date, the district court entered final judgment in the case and also issued an order denying Pavatt a COA with respect to all of the issues raised in his habeas petition.

Pavatt filed a notice of appeal on June 2, 2014. In a case management order issued on November 24, 2014, we granted Pavatt a COA on the following issues: (1) "[w]hether there was sufficient evidence to support the [HAC] aggravator (raised in Ground 10 of . . . Pavatt's habeas petition)"; (2) "whether the trial court's failure to provide an adequate instruction to the jury that it must find 'conscious physical suffering' beyond a reasonable doubt before finding that the murder was 'especially heinous, atrocious, or cruel' violated . . . Pavatt's constitutional rights to a fair trial, a reliable sentencing determination, and due process (raised in Ground 11 of . . . Pavatt's habeas petition)"; (3) "[w]hether there

9

was constitutionally ineffective assistance of trial counsel regarding the investigation of mitigating evidence or the presentation of a meaningful case for life imprisonment (raised in Ground 15, Claim I.I., of . . . Pavatt's habeas petition)"; (4) "whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective" regarding the investigation of mitigating evidence or the presentation of a meaningful case for life imprisonment; and (5) "[w]hether trial counsel provided constitutionally ineffective assistance regarding the introduction of a camping video, live photographs of the victim, or testimony regarding the victim's good traits (raised in Ground 15, Claim I.E., of . . . Pavatt's habeas petition), and whether appellate counsel was constitutionally ineffective in failing to raise a claim that trial counsel was ineffective in these regards."  Case Mgmt. Order at 1–2.

The original hearing panel affirmed the district court's denial of relief with respect to Pavatt's convictions, but in a divided decision reversed the denial of relief with respect to Pavatt's death sentence and remanded to the district court for further proceedings. Respondent filed a petition for rehearing en banc, which we granted.[4]

---

[4] Because we are vacating the original panel opinion, we must address all of the issues originally raised by Pavatt in his opening appellate brief.  That said, Pavatt did not seek rehearing of the original panel's unanimous affirmance of his convictions. Consequently, our analysis of the issues related to his conviction adheres closely to the original panel opinion.

## II

### *Standard of review*

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner seeking federal habeas relief first to 'exhaus[t] the remedies available in the courts of the State.'" Kernan v. Hinojosa, 136 S. Ct. 1603, 1604 (2016) (per curiam) (alteration in original) (quoting 28 U.S.C. § 2254(b)(1)(A)). "If the state courts adjudicate the prisoner's federal claim 'on the merits,' § 2254(d), then AEDPA mandates deferential, rather than *de novo*, review . . . ." Id. Specifically, this court cannot grant relief unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d)(1)–(2).

"'Clearly established Federal Law' refers to the Supreme Court's holdings, not its dicta." Wood v. Carpenter, 907 F.3d 1279, 1289 (10th Cir. 2018) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)), petition for cert. filed, No. 18-8666 (U.S. Mar. 29, 2019). "A state-court decision is only contrary to clearly established federal law if it 'arrives at a conclusion opposite to that reached by' the Supreme Court, or 'decides a case differently' than the Court on a 'set of materially indistinguishable facts.'" Id. (quoting Williams, 529 U.S. at 412–13). "But a state court need not cite the Court's cases or, for that matter, even be aware of them." Id. "So long as the state-court's

11

reasoning and result are not contrary to the Court's specific holdings, § 2254(d)(1) prohibits [this court] from granting relief." Id. (citing Early v. Packer, 537 U.S. 3, 9 (2002) (per curiam)).

"A state court's decision unreasonably applies federal law if it 'identifies the correct governing legal principle' from the relevant Supreme Court decisions but applies those principles in an objectively unreasonable manner." Id. (quoting Wiggins v. Smith, 539 U.S. 510, 520 (2003)). "Critically, an '*unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Id. (quoting Williams, 529 U.S. at 410 (emphasis in original)). "[A] state court's application of federal law is only unreasonable if 'all fairminded jurists would agree the state court decision was incorrect.'" Id. (quoting Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014)).

"Finally, a state-court decision unreasonably determines the facts if the state court 'plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim.'" Id. (quoting Byrd v. Workman, 645 F.3d 1159, 1170–72 (10th Cir. 2011)). "But this 'daunting standard' will be 'satisfied in relatively few cases.'" Id. (quoting Byrd, 645 F.3d at 1172).

*Sufficiency of evidence challenge to the HAC aggravator*

In Proposition One of his appellate brief, Pavatt challenges the sufficiency of the evidence supporting the HAC aggravator found by the jury at the conclusion of the second-stage proceedings. Aplt. Br. at 20. According to Pavatt, the evidence presented

12

at his trial was "constitutionally insufficient" to establish that the murder of Rob Andrew was "especially heinous, atrocious, or cruel," and, he asserts, "[t]he OCCA's determination" to the contrary was "unreasonable." Id. at 20–21.

*a) Clearly established federal law applicable to the claim*

It is clearly established that "the fundamental protection of due process of law" requires that the evidence presented at a criminal trial, viewed in the light most favorable to the prosecution, be sufficient to allow "*any* rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Because most states' "enumerated aggravating factors" for capital cases "operate as 'the functional equivalent of an element of a greater offense,'" Ring v. Arizona, 536 U.S. 584, 609 (2002) (quoting Apprendi v. New Jersey, 530 U.S. 466, 494 n. 19 (2000)), this same due process requirement applies to any aggravating factor alleged by the prosecution and found by the jury in a capital case. Thus, in sum, a state capital defendant seeking federal habeas relief from his or her death sentence can assert a sufficiency-of-the-evidence challenge to any of the aggravating factors found by the jury.

*b) The OCCA's general construction of the HAC aggravator*

Before we examine whether and how the OCCA addressed Pavatt's sufficiency-of-evidence challenge to the HAC aggravator, we pause briefly to review how the OCCA has generally construed the HAC aggravator. In Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987), the OCCA expressly "restrict[ed] . . . application" of the HAC

13

aggravator "to those murders in which torture or serious physical abuse is present." More specifically, the OCCA "identified two kinds of cases in which 'torture or serious physical abuse' [will be deemed to be] present: those characterized by the infliction of 'great physical anguish' and those characterized by the infliction of 'extreme mental cruelty.'" Medlock v. Ward, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring) (quoting Cheney v. State, 909 P.2d 74, 80 (Okla. Crim. App. 1995)). "In the mental cruelty context, the OCCA has emphasized that the torture required for finding the 'heinous, atrocious, or cruel' aggravator must produce mental anguish in addition to that which of necessity accompanies the underlying killing." Id. (quotation marks omitted). And, with respect to the physical anguish branch of its test, the OCCA has held that, "[a]bsent evidence of conscious physical suffering by the victim prior to death, the required torture or serious physical abuse standard is not met." Battenfield v. State, 816 P.2d 555, 565 (Okla. Crim. App. 1991).

In Nuckols v. State, 805 P.2d 672, 674 (Okla. Crim. App. 1991), the OCCA held that the HAC aggravator "contemplates a two-step analysis." The first step of this analysis, the OCCA stated, requires the jury to determine whether the death of the victim was preceded by torture or serious physical abuse. Id. "Once this foundational assessment is made," the OCCA stated, "then the jury may apply the definitions given to them . . . to measure whether or not the crime can be considered to have been heinous, atrocious or cruel." Id.

14

*c) The OCCA's resolution of Pavatt's challenge to the HAC aggravator*

In his direct appeal, Pavatt challenged the sufficiency of the evidence supporting

the HAC aggravator. Proposition XIV of Pavatt's direct appeal brief was titled: "There

was insufficient evidence to support the 'especially heinous, atrocious or cruel'

aggravating circumstance." Direct Appeal Br. at iv (capitalization omitted). In the body

of his direct appeal brief, Pavatt argued, in support of Proposition XIV, that "[t]he

evidence does not support the fact that the murder was 'especially' heinous, atrocious or

cruel." Id. at 47. He in turn quoted the following statement made by his defense counsel

during the second-stage closing arguments: "'To some degree I suppose all homicides are

heinous, atrocious or cruel. I think that's the reason why our legislature has inflicted the

term especially to that phrase.'" Id. Lastly, Pavatt commented briefly on the evidence

presented by the state in support of the HAC aggravator:

> Interestingly, the State attempts to prove the existence of the
> aggravating circumstance on the basis of the information provided by
> Brenda Andrew in her 911 call to the police. (Tr. 3763) The medical
> examiner's testimony was that either of the two wounds could have been
> fatal. Death occurred in a matter of minutes. The medical examiner could
> not tell how long Mr. Andrew was conscious. (Tr. 3764)

Id.

The OCCA rejected this claim on the merits:

> In Propositions 14 and 15, [Pavatt] challenges the sufficiency of the
> evidence to support the two aggravating circumstances alleged by the State
> as warranting the death penalty. Such challenges are reviewed under the
> same standard as challenges to the evidence supporting a criminal
> conviction. We consider the evidence in a light most favorable to the State,
> and determine whether any rational juror could have found the existence of
> the challenged aggravating circumstance beyond a reasonable doubt.

15

DeRosa [v. State], 2004 OK CR 19 at ¶ 85, 89 P.3d at 1153; Lockett v. State, 2002 OK CR 30, ¶ 39, 53 P.3d 418, 430.

In Proposition 14, [Pavatt] claims the evidence was insufficient to support the jury's finding that the murder of Rob Andrew was "especially heinous, atrocious, or cruel." To establish this aggravator, the State must present evidence from which the jury could find that the victim's death was preceded by either serious physical abuse or torture. Evidence that the victim was conscious and aware of the attack supports a finding of torture. Davis v. State, 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81; Black v. State, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074 (evidence that victim consciously suffered pain during and after stabbing was sufficient to support this aggravating circumstance); Le [v. State], 1997 OK CR 55 at ¶ 35, 947 P.2d at 550; Romano v. State, 1995 OK CR 74, ¶ 70, 909 P.2d 92, 118; Berget v. State, 1991 OK CR 121, ¶ 31, 824 P.2d 364, 373. Our evaluation is not a mechanistic exercise. As we stated in Robinson v. State, 1995 OK CR 25, ¶ 36, 900 P.2d 389, 401:

> As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved. Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the evidence claim supporting the heinous, atrocious or cruel aggravator.

The evidence presented at trial showed that Rob Andrew suffered numerous wounds resulting from two shotgun blasts, which damaged his internal organs. The medical examiner testified that either wound would have caused sufficient blood loss to be independently fatal, but that death was not instantaneous. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to ward off his attacker or shield himself from being shot. Brenda Andrew called 911 twice after the shooting; together, the two calls spanned several minutes. During the second call, she claimed that her husband was still conscious and attempting to talk to her as he lay bleeding to death on the garage floor. All of these facts tend to show that

16

Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes.  See Ledbetter v. State, 1997 OK CR 5, ¶ 53, 933 P.2d 880, 896 (evidence that murder victim was likely aware that she was about to be assaulted because defendant had attempted to kill her one week earlier, that she tried to defend herself from the fatal attack, and that she attempted to communicate with a neighbor after the attack was sufficient to show that the murder was especially heinous, atrocious or cruel).

After finding that the murder was accompanied by torture or serious physical abuse, the jury may also consider the attitude of the killer and the pitiless nature of the crime.  Lott [v. State], 2004 OK CR 27 at ¶ 172, 98 P.3d at 358; Phillips v. State, 1999 OK CR 38, ¶ 80, 989 P.2d 1017, 1039. That the victim was acquainted with his killers is a fact relevant to whether the murder was especially heinous, atrocious, or cruel.  In finding the murder in Boutwell v. State, 1983 OK CR 17, ¶ 40, 659 P.2d 322, 329 to be especially heinous, atrocious, or cruel, this Court observed:

> In this case the killing was merciless. The robbers planned well in advance to take the victim's life. Even more abhorrent and indicative of cold pitilessness is the fact that the appellant and the victim knew each other.

We find the situation in the present case even more pitiless.  Rob Andrew correctly suspected his wife of having an affair with a man he trusted as his insurance agent.  He correctly suspected his wife and her lover of trying to wrest control of his life insurance away from him.  He correctly suspected his wife and her lover of attempting to kill him several weeks before by severing the brake lines on his car.  He confided in others that he was in fear of his life.  Having separated from his wife, Rob Andrew was murdered as he returned to the family home to pick up his children for the Thanksgiving holiday.  From the evidence, a rational juror could have concluded, beyond a reasonable doubt, that Rob Andrew had time to reflect on this cruel state of affairs before he died.  The evidence supported this aggravating circumstance, and this proposition is denied.

Pavatt I, 159 P.3d at 294–95 (paragraph numbers omitted).

17

*d) Pavatt's challenge to the OCCA's decision*

In challenging the OCCA's decision, Pavatt begins by offering his own summary of the relevant evidence, arguing that the crime at issue resulted in "[a] shotgun death" that involved "no conscious suffering beyond what accompanies any murder." Aplt. Br. at 21. According to Pavatt, "[t]here was no gratuitous violence," "no torture," and "no anguish or suffering beyond that which necessarily accompanied the underlying killing." Id. Further, Pavatt argues that "[t]he two shotgun blasts were both independently fatal" and Rob Andrew "could not have remained conscious for more than a few moments, before going into shock and quickly bleeding to death." Id. at 21–22. In sum, Pavatt argues, "[i]f Rob Andrew's homicide was 'heinous, atrocious or cruel,' then any murder in which the victim does not die instantly satisfies this factor." Id. at 22.

The problem with Pavatt's description of the evidence, however, is that it wholly ignores not only the evidence the jury heard, but also the standard of review mandated by the Supreme Court in Jackson. As we have noted, Jackson requires a reviewing court to "view[] the evidence in the light most favorable to the prosecution." 443 U.S. at 319. When that standard is applied to the evidence presented in Pavatt's case, it simply does not support his description of what occurred. Although it is true that each of the shotgun blasts were independently lethal, Pavatt is incorrect in asserting that Rob Andrew "could not have remained conscious for more than a few moments." Aplt. Br. at 21. Indeed, the medical examiner who testified on behalf of the prosecution conceded it was possible that Rob Andrew remained conscious for several minutes after sustaining the wounds. And

18

that testimony, combined with Brenda Andrew's statements to the 911 operator regarding Rob Andrew's condition (which we will discuss in greater detail below), would have allowed the jury to reasonably find that he indeed remained conscious far longer than "a few moments."

Pavatt also argues that the OCCA "relied on irrelevant speculation about what Rob [Andrew] was feeling." Id. at 24. In support, Pavatt examines and attempts to discredit each of the factors cited by the OCCA in support of its determination. To begin with, Pavatt asserts that "[t]he 'numerous wounds' referred to by the OCCA were caused by pellets from the same shotgun, shot at nearly the same time." Id. at 32. Although Pavatt is correct on this point, that does not prove the OCCA's determination to be wrong. Indeed, the medical examiner testified at trial that the two shotgun blasts damaged Rob Andrew's right lung, aorta, and liver. In addition, the photographs of Rob Andrew's body quite clearly indicate that the shotgun pellets caused numerous, separate entry and exit wounds on his body. And, although Pavatt asserts that these wounds "did not contribute to an inordinate amount of conscious pain prior to death," id. at 30, the medical examiner testified to the contrary, noting the wounds would, indeed, have been painful.

Pavatt in turn argues that, contrary to the OCCA's determination, "the quick loss of blood from both wounds resulted in shock and loss of consciousness within one minute." Id. But this argument ignores, and is ultimately contrary to, the testimony of the medical examiner. The medical examiner testified that, as a result of the blood loss

19

associated with the wounds, Rob Andrew would have lost consciousness before he actually died. The medical examiner opined that Rob Andrew would have died "[l]ess than ten" minutes after sustaining the gunshot wounds, but could have survived for five or six minutes. Tr., Vol. X at 2457–58. The medical examiner declined on direct examination to "give . . . an exact time" frame that Rob Andrew would have maintained consciousness. Id. at 2458. On cross-examination, the medical examiner agreed that it was possible that Rob Andrew died less than one minute after sustaining the wounds. Id. at 2466. On redirect, the medical examiner testified it was also possible that Rob Andrew remained conscious for more than one minute after sustaining the wounds. Ultimately, the medical examiner's testimony, construed in the light most favorable to the prosecution, and considered together with other evidence presented by the prosecution, would have allowed the jury to find that Rob Andrew remained conscious for several minutes after sustaining the wounds.

Pavatt argues that the fact that Rob Andrew was found "clutching the plastic trash bag was meaningless in determining whether [he] consciously suffered and thus, it was unreasonable for the OCCA to speculate about why [he] may have been holding the bag." Aplt. Br. at 30. We disagree. At trial, the prosecution presented testimony from two witnesses on this very point. The first witness, Norman Nunley, was a longtime friend of the Andrews. Tr., Vol. V at 1363. Nunley testified that he first learned of Rob Andrew's death from Brenda Andrew, when she called him the morning after the murder. Id. at 1381. According to Nunley, Brenda Andrew gave him a brief description of the shooting

20

and, in particular, "said [that] prior to the second shot [Rob Andrew] had grabbed a trash bag full of, like, pop cans or something and tried to hold it up between him and the gun." Id. at 1382. The second witness, Roger Frost, was an Oklahoma City police officer and one of the first people to respond to Brenda Andrew's 911 call. Frost testified that when he arrived at the Andrews' house, he discovered Brenda Andrew sitting in the doorway to the garage, approximately three feet from Rob Andrew's body. Id., Vol. IX at 2170. Frost further testified that he removed Brenda Andrew from the crime scene, walked her to an area outside of her house, and had her sit on the curb so that the paramedics could treat her. Id. at 2174–75. Frost testified that he asked Brenda Andrew for information about what had happened and that she told him, in pertinent part, that Rob Andrew had grabbed the plastic bag full of cans as an apparent means of self-defense. Id. at 2176. Because the OCCA was obligated under Jackson to view the evidence in the light most favorable to the prosecution, it was entirely reasonable for it to accept this testimony of Nunley and Frost as true. And that determination was relevant to the OCCA's assessment of the sufficiency of the evidence supporting the HAC aggravator because it would have supported a finding that Rob Andrew remained not only conscious, but mobile and acting defensively, after the first shotgun blast.

Somewhat relatedly, Pavatt complains that it was unreasonable for the OCCA "to conclude that Rob [Andrew] consciously suffered based on Brenda[ Andrew]'s statements in her 911 calls, when everything she said in those calls was determined to be false." Aplt. Br. at 30. The fallacy of this argument, however, is the notion that all of

21

Brenda Andrew's statements to the 911 operator (or, for that matter, her statements to other people, such as Mr. Nunley) were proven to be false. The fact of the matter is that at least some of Brenda Andrew's statements during the two 911 calls were obviously true. For example, it is undisputed that she was physically present with Rob Andrew after he suffered the two shotgun blasts and during at least the second 911 call. Further, her statements to the 911 operator that she and Rob Andrew had been shot were indisputably true. Likewise, some of her statements describing what she was witnessing, such as the arrival of police officers to her house, were also quite clearly true (indeed, officers' voices can be heard in the background during the second 911 call at the precise time that Brenda Andrew tells the 911 operator that the police have arrived on the scene). Thus, the jury, having listened to recordings of both 911 calls, was left to decide whether her statements to the 911 operator regarding Rob Andrew's condition, including her statement that he was conscious and attempting to talk to her, and her repeated statements that he was breathing, were credible or not. Although the jury was not bound to give credence to those statements, it was certainly within the jury's province to do so. See Perry v. New Hampshire, 565 U.S. 228, 252 (2012) (Sotomayor, J., dissenting) (noting it is "the jury's task [to] assess[] witness credibility and reliability"). Consequently, we conclude it was in turn reasonable for the OCCA, applying the standard of review mandated by Jackson, to treat as credible Brenda's statements regarding Rob Andrew's condition in assessing the sufficiency of the evidence to support the HAC aggravator.

22

Finally, Pavatt argues that no "deference [should be] afforded [the jury's verdict] under Jackson" because "[t]here were no conflicting facts about how Rob [Andrew] died." Aplt. Br. at 22. We reject that argument. Jackson provides, in relevant part, that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." 443 U.S. at 326. That is precisely the situation we have here. As we have already explained, the evidence presented at Pavatt's trial most certainly "supports conflicting inferences" regarding how long Rob Andrew remained conscious after sustaining the first and then the second shotgun blasts. We therefore must presume that the jury in Pavatt's trial, having found the existence of the HAC aggravator, resolved these conflicts in favor of the prosecution. And, in turn, we, like the OCCA, must defer to that resolution.

In sum, we conclude that Pavatt has failed to establish that the OCCA's determination that the evidence was sufficient to support the HAC aggravator was contrary to, or involved an unreasonable application of, clearly established federal law. Thus, Pavatt is not entitled to federal habeas relief on this claim.

*Pavatt's as-applied challenge to the HAC aggravator*

As part of Proposition One of his appellate brief, Pavatt also attempts to assert an as-applied challenge to the HAC aggravator. Specifically, Pavatt argues that the OCCA, in considering his Jackson challenge to the HAC aggravator on direct appeal,

23

"unreasonably failed to follow its own precedent" that had adopted a constitutionally narrow construction of the HAC aggravator, "compounded its historically inconsistent approach to what Oklahoma requires to support the HAC aggravator," and, ultimately, applied an unconstitutionally overbroad definition of the HAC aggravator in affirming his death sentence. Aplt. Br. at 24.

In our October 2, 2018 order granting respondent's petition for rehearing *en banc*, we directed the parties to file supplemental briefs addressing a number of questions concerning whether this as-applied challenge to the HAC aggravator is properly before us. To begin with, we asked the parties whether Pavatt's as-applied challenge was "presented to and addressed by the OCCA," i.e., "did Pavatt exhaust th[is] claim[] in the Oklahoma state courts," and, relatedly, whether the claim was procedurally barred. Order at 2, Oct. 2, 2018.

A threshold question in any case involving a request for federal habeas relief under § 2254 is whether "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Generally speaking, "[a] federal court may not grant" an application for federal habeas relief "unless . . . the applicant has exhausted state remedies before filing his petition." Simpson v. Carpenter, 912 F.3d 542, 564 (10th Cir. 2018). "[T]o exhaust state remedies, a petitioner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." Id. at 565 (quotations omitted). "This is accomplished by providing the state courts one full opportunity to resolve any constitutional issues by invoking one

24

complete round of the State's established appellate review process." Id. (quotations omitted). "A claim is exhausted only after it has been fairly presented to the state court." Id. (quotations omitted). "Fair presentation requires that the substance of the federal claim was raised in state court." Id. (quotations omitted).

Pavatt, as we have noted, asserted a Jackson challenge to the HAC aggravator in his direct appeal and the OCCA rejected that Jackson challenge. Pavatt's original application for state postconviction relief did not assert any issue relating to the HAC aggravator. Proposition Five of Pavatt's second application for state postconviction relief asserted the following challenge to the HAC aggravator: "The Eighth and Fourteenth Amendments to the United States Constitution are violated by Oklahoma's continued use of the facially vague aggravating circumstance that a murder is: especially heinous, atrocious, or cruel." Second Appl. for Post-Conviction Relief, at vii (capitalization omitted). In support, Pavatt cited to various OCCA cases applying the HAC aggravator, and he argued that, "[i]nexplicably," the OCCA "found serious physical abuse in [his] case, even though there was no gratuitous violence, and the killing was much like that in Cartwright[ v. Maynard, 822 F.2d 1477 (10th Cir. 1987) (en banc)]."[5] Id. at 32. The

---

[5] In Cartwright, the defendant "fire[d] two blasts from [a] shotgun" into the victim, resulting in the victim's death. Cartwright v. State, 695 P.2d 548, 550 (Okla. Crim. App. 1985). On direct appeal, the OCCA concluded that the evidence presented at trial supported the jury's finding of the HAC aggravator. Id. at 554. In doing so, however, the OCCA did not discuss whether the victim remained conscious after the two shotgun blasts. Instead, the OCCA considered "the circumstances attendant to the murder," including the fact that the defendant had expressed the intention to get even with the victims, that the defendant had hid inside the victims' home waiting for them to

25

OCCA concluded that Proposition Five was procedurally barred. Specifically, the OCCA concluded that this "legal argument could have been raised in prior proceedings, but was not," and was "therefore waived." Pavatt III, No. PCD-2009-777 at 6 (citing Okla. Stat. tit. 22, § 1089(D)(8)).

We are not persuaded, after reviewing the state court pleadings, that Pavatt fairly presented to the OCCA the as-applied arguments that he now seeks to assert in this federal habeas appeal. To begin with, we reject the notion that the Jackson challenge that Pavatt asserted in his direct appeal necessarily incorporated an as-applied challenge to the HAC aggravator. [6] Indeed, Pavatt's Jackson claim could not have incorporated the as-

---

return, that he attacked the female victim (who survived the attack) upon being discovered, that the murder victim "doubtless heard" his wife being shot and "quite possibly experienced a moment of terror as he was confronted by the [defendant] and realized his impending doom," that the defendant "again attempted to kill [the female victim] in a brutal fashion upon discovery that his first attempt was unsuccessful," that the defendant "attempted to conceal his deeds by disconnecting the telephone and posting a note on the door," and that the defendant attempted to steal goods belonging to the victims. Id.

On federal habeas review, this court, sitting *en banc*, held that the OCCA "failed to apply a constitutionally required narrowing construction of [the HAC aggravator] in this case." Cartwright, 822 F.2d at 1491. The Supreme Court subsequently granted certiorari in the case and affirmed this court's decision. Maynard v. Cartwright, 486 U.S. 356, 366 (1988).

Following this court's decision in Cartwright, the OCCA "restricted the [HAC aggravator] to those murders in which torture or serious physical abuse is present." Id. at 365 (citing Stouffer, 742 P.2d 562).

[6] A Jackson challenge to a jury's finding of the HAC aggravator, which relies on the Due Process Clause of the Fourteenth Amendment, is a separate and distinct legal claim from an Eighth Amendment challenge to the HAC aggravator. That said, we do not foreclose the possibility that a petitioner may, depending on the circumstances, assert a Jackson claim and an Eighth Amendment claim in the same proceeding. We hold only

26

applied arguments that he now attempts to make in this federal habeas appeal because his as-applied arguments challenge only the manner in which the OCCA, in disposing of his Jackson challenge on direct appeal, construed the HAC aggravator. We further conclude that Pavatt's second application for post-conviction relief plainly asserted a facial vagueness challenge to the HAC aggravator, but, at best, only hinted at an as-applied challenge to the HAC aggravator. Consequently, we conclude that the as-applied arguments Pavatt now presents in his federal appellate brief were not fairly presented to the OCCA and are thus unexhausted and, in turn, subject to an anticipatory procedural bar.[7] See Moore v. Schoeman, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002).

That is not the end of the matter, however, because in our October 2, 2018 order we directed the parties to address whether "respondent, through counsel, expressly waived the exhaustion requirement for purposes of 28 U.S.C. § 2254(b)(3)" with respect to Pavatt's as-applied challenge to the HAC aggravator. Order at 2, Oct. 2, 2018. We

---

that the Eighth Amendment as-applied claim that Pavatt now seeks to assert was not, and could not have been, asserted in his direct appeal because it focuses on the manner in which the OCCA applied the HAC aggravator in rejecting Pavatt's Jackson claim on direct appeal.

[7] In our October 2, 2018 order, we directed the parties to address the question of whether "this court [should] *sua sponte* raise the exhaustion issue." Order at 2. Pavatt concedes, as he must, that we possess the authority to consider the issue of exhaustion *sua sponte*. Aplt. Supp. Br. at 19; see United States v. Mitchell, 518 F.3d 740, 746 n.8 (10th Cir. 2008) (noting that *"[s]ua sponte* consideration of exhaustion of state remedies . . . is explicitly permitted by Supreme Court precedent.") (citing Gransberry v. Greer, 481 U.S. 129, 133 (1987), and Caspari v. Bohlen, 510 U.S. 383, 389 (1994)).

also directed the parties to address whether "respondent expressly waived [procedural bar] as a defense." Id.

Section 2254(b)(3), which we referenced in our order, provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). Having reviewed the parties' supplemental briefs and the record in this case, we conclude that respondent did not expressly waive the exhaustion requirement with respect to the arguments that Pavatt now seeks to assert on appeal.

Ground Ten of Pavatt's federal habeas petition plainly asserted a Jackson challenge to the HAC aggravator, but at best (similar to his second application for state postconviction relief) only hinted at the possibility of an as-applied challenge to the HAC aggravator. In particular, Ground Ten of Pavatt's federal habeas petition, in addition to discussing in detail why the evidence presented at trial was insufficient to allow the jury to reasonably find the HAC aggravator, mentioned but did not discuss the Eighth and Fourteenth Amendments, and also mentioned, but did not discuss the meaning of, "a constitutionally narrowed construction of the [HAC] aggravator." ROA, Vol. 1 at 185 (Dist. Ct. Docket No. 42 at 155).

Not surprisingly, neither respondent nor the district court read Ground Ten as asserting a separate, as-applied challenge to the HAC aggravator, i.e., that the OCCA failed, on direct appeal, to apply the HAC aggravator in a constitutionally permissible

28

manner.[8]  Thus, neither respondent nor the district court addressed the question of whether Pavatt had exhausted his state court remedies with respect to an as-applied challenge to the HAC aggravator.  And, accordingly, at no time did respondent expressly waive the exhaustion requirement with respect to an as-applied challenge to the HAC aggravator.

To be sure, Pavatt argues in his supplemental response brief that respondent "expressly waived" the exhaustion requirement with respect to Pavatt's as-applied arguments.  Aplt. Supp. Br. at 18.  In support, Pavatt cites to page 128 of respondent's answer to Pavatt's habeas petition.  A review of that cited page, however, reveals that respondent conceded exhaustion only as to Pavatt's Jackson claim.  ROA, Vol. 3 at 560 (Dist. Ct. Docket No. 69 at 128) ("In Ground Ten, Petitioner alleges that insufficient evidence was presented at trial to support the jury's finding of the [HAC] aggravator.); id. ("This claim was raised on direct appeal and the OCCA rejected it on the merits.  Pavatt [I], 159 P.3d at 294–95.  It is therefore exhausted for purposes of federal habeas

---

[8] The district court interpreted Ground Ten as asserting a Jackson claim and also an argument "that the OCCA applied the incorrect standard of review" in assessing Pavatt's insufficiency-of-evidence challenge on direct appeal.  ROA, Vol. 3 at 1128 (Dist. Ct. Docket No. 91 at 80).  More specifically, the district court interpreted Ground Ten of Pavatt's habeas petition as arguing, in part, "that the OCCA should have applied the reasonable hypothesis test instead of Jackson" in reviewing the evidence presented at trial, including the statements made by Brenda Andrew during the 911 call.  Id. at 1131 (Dist. Ct. Docket No. 91 at 83 n.40).  In rejecting this latter argument, the district court noted: "it is clear that the OCCA applied Jackson and that it was the correct (and constitutional) standard to be applied."  Id. at 1130–31 (Dist. Ct. Docket No. 91 at 82–83).

29

review."). Thus, Pavatt's assertion that respondent expressly waived the exhaustion requirement with respect to Pavatt's as-applied arguments is without merit.

We likewise conclude that respondent did not expressly waive procedural bar as a defense. As we have discussed, it was far from clear that Pavatt intended to assert an as-applied challenge to the HAC aggravator in his federal habeas petition, and, in fact, both respondent and the district court reasonably interpreted Pavatt's habeas petition as asserting only a Jackson challenge to the HAC aggravator. Consequently, we do not construe any of respondent's district court pleadings as expressly waiving procedural bar as a defense to the as-applied claim.

Finally, our October 2, 2018 order directed the parties to address the questions of whether Pavatt's as-applied challenge was "resolved by the district court," whether "a COA [was] granted on th[is] claim[]," and whether the claim was "included in this court's case management order as [an] issue[] to be raised by Pavatt." Order at 2, Oct. 2, 2018. Because the district court reasonably did not perceive Pavatt's habeas petition as asserting an as-applied challenge to the HAC aggravator, it did not address, let alone resolve, that claim, and it did not grant a COA on the claim. Nor, in turn, did this court grant a COA on any as-applied challenge to the HAC aggravator. Consequently, the as-applied claim was not included in this court's case management order as an issue to be raised by Pavatt and briefed by the parties.

30

For all of these reasons, we conclude that the as-applied challenge to the HAC aggravator that Pavatt asserts in his federal appellate brief is not properly before us and cannot serve as the basis for the grant of federal habeas relief.[9]

*Facial challenge to the HAC aggravator*

In both Ground Eleven and Ground Thirteen of his federal habeas petition, Pavatt referred to the HAC aggravator as being facially vague. ROA, Vol. 1 at 191, 202 (Dist. Ct. Docket No. 42 at 161, 172). Neither Ground Eleven nor Ground Thirteen, however, directly asserted a facial challenge to the HAC aggravator. Instead, Ground Eleven focused on the adequacy of the instructions given to the jury in Pavatt's case regarding the HAC aggravator, and Ground Thirteen asserted that Oklahoma's Uniform Jury Instruction defining the terms "heinous," "atrocious," and "cruel" failed to adhere to the constitutionally narrowing construction that had been adopted by the OCCA following this court's decision in Cartwright.

Respondent did not interpret Pavatt's habeas petition as asserting a facial challenge to the HAC aggravator. But the district court, perhaps out of an abundance of caution, construed Ground Thirteen as challenging the HAC aggravator "on the ground that it is unconstitutionally vague on its face." Id., Vol. 3 at 1138 (Dist. Ct. Docket No. 91 at 90). The district court concluded, however, that this facial challenge was "barred from federal review" because it was "not presented to the OCCA until [Pavatt's] second

---

[9] Consequently, we do not reach the issues outlined in Questions 2(h), (i), (j), or (k) of our October 2, 2018 Order directing the parties to file supplemental briefs, all of which concerned the merits of Pavatt's as-applied challenge to the HAC aggravator.

31

post-conviction application." Id. The district court also noted, in any event, that the OCCA had, in response to this court's decision in Cartwright, adopted a constitutionally narrowing construction of the HAC aggravator.

The district court did not grant a COA as to Ground Thirteen. Likewise, we did not grant a COA as to Ground Thirteen (or to any facial challenge to the HAC aggravator) or include it in our case management order as an issue to be raised by Pavatt on appeal. And, in turn, Pavatt's opening appellate brief makes no mention of Ground Thirteen or any facial challenge to the HAC aggravator.

For these reasons, we conclude that there is no facial challenge to the HAC aggravator that is properly before us.

*Adequacy of instruction on the HAC aggravator*

In Proposition Two of his appellate brief, Pavatt contends that the state trial court's instructions to the jury regarding the HAC aggravator failed to adequately inform them that they must find "conscious physical suffering" before concluding that the murder was "especially heinous, atrocious, or cruel."

*a) Facts relevant to this claim*

Prior to trial, Pavatt filed an objection "to the pattern verdict form, OUJI-CR 2d 4-84, on the grounds [that] the special findings, i.e., the aggravating circumstances, [we]re ill-defined, vague and d[id] not check the unbridled discretion of the sentencer." State R., Vol. VII at 1286. Pavatt subsequently filed an objection to the uniform instruction and

32

verdict form regarding the HAC aggravator, arguing "that [they were] unconstitutional" in light of the Supreme Court's decision in Cartwright. Id., Vol. VIII at 1471.

The state trial court overruled Pavatt's objections and, at the conclusion of the second-stage proceedings, gave the jury the following instruction regarding the HAC aggravator:

Instruction Number 5

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile: "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

Id., Vol. XI at 2052. As for the second-stage verdict form, it simply asked the jury to check whether or not they found the existence of each of the alleged aggravating circumstances. Id. at 2063. The verdict form did not otherwise explain or attempt to define the HAC aggravator.

The jury, after deliberating, indicated that they found the existence of the HAC aggravator. The jury also indicated that it found that Pavatt committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration.

b) *Pavatt's presentation of the issue to the OCCA*

Although Pavatt argued on direct appeal that the evidence presented at trial was insufficient to support the HAC aggravator, he did not challenge on direct appeal the

33

adequacy of the HAC instruction or the verdict form. Nor did he raise the issue in his initial application for post-conviction relief. Instead, Pavatt waited until he filed his second application for post-conviction relief to raise the issue. In Proposition Four of that application, Pavatt argued that the state trial court violated his constitutional rights by failing to provide an adequate instruction that informed the jury that it must find "conscious physical suffering" beyond a reasonable doubt before concluding that the murder was "especially heinous, atrocious, or cruel." Second Appl. for Post-Conviction Relief, at 27–31.

### c) The OCCA's resolution of the claim

In its opinion denying Pavatt's second application for post-conviction relief, the OCCA concluded that this claim was procedurally barred: "Because this argument is based on the trial record, it could have been made in prior proceedings, and may not be considered now." Pavatt III, No. PCD-2009-777 at 5 (citing Okla. Stat. tit. 22, § 1089(D)(8)). In a related footnote, the OCCA also stated:

> In any event, we have rejected the same argument several times in the past. [Pavatt] essentially asks this Court to retroactively require an instruction that we promulgated—after [Pavatt]'s conviction — in *DeRosa v. State*, 2004 OK CR 19, ¶¶ 91–97, 89 P.3d 1124, 1154-57. That instruction elaborates on the meaning of "heinous, atrocious, or cruel," and the relevant Uniform Jury Instruction already in existence (No. 4-73) was amended a year later. *DeRosa* was handed down several months after [Pavatt]'s trial. *DeRosa* does not hold that the Uniform Jury Instruction on this issue, being used at the time of DeRosa's and [Pavatt]'s trials, was materially deficient. *DeRosa*, 2004 OK CR 19, ¶ 97, 89 P.3d at 1156 ("This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate"). This same attack on the pre-*DeRosa* version of OUJI-CR (2nd) No. 4-73 has been rejected several times by this Court. *Jackson v. State*, 2006 OK CR 45, ¶¶ 36-38, 146 P.3d 1149, 1161-63;

34

> *Browning v. State*, 2006 OK CR 8, ¶¶ 52-56, 134 P.3d 816, 843-45; *Rojem v. State*, 2006 OK CR 7, ¶¶ 68–73, 130 P.3d 287, 300-01.

Id. at 5 n.5.

In DeRosa, the OCCA incorporated the two-step analysis into its uniform jury instruction defining the HAC aggravator and directed that this instruction was to "be used in all future capital murder trials in which the" HAC aggravator was alleged. 89 P.3d at 1156. The instruction read as follows:

> The State has alleged that the murder was "especially heinous, atrocious, or cruel." This aggravating circumstance is not established unless the State proves beyond a reasonable doubt:

>> *First*, that the murder was preceded by either torture of the victim or serious physical abuse of the victim; and

>> *Second*, that the facts and circumstances of this case establish that the murder was heinous, atrocious, or cruel.

> You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his/her death.

> In addition, you are instructed that the term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

Id. The OCCA emphasized that "[t]his instruction d[id] not change any of the legal requirements of the [HAC aggravator]." Id. "Rather," the OCCA noted, "it [wa]s intended to more fully inform the jury regarding the findings that must be made in order

35

to properly apply the aggravator and to ensure that a jury determination is made regarding each of these findings." Id.

### d) *The district court's procedural bar ruling*

The district court concluded that Pavatt's challenge to the state trial court's HAC instruction was "barred from federal review." ROA, Vol. 3 at 1138 (Dist. Ct. Docket No. 91 at 90). In support, the district court stated that "[t]he Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not." Id. at 1079 (Dist. Ct. Docket No. 91 at 31). The district court also concluded that "the OCCA's procedural bar here [wa]s adequate and independent." Id. at 1080 (Dist. Ct. Docket No. 91 at 32). Lastly, the district court concluded that Pavatt had "not made any showing of cause and prejudice to excuse his default of th[is] claim[]," nor had he shown "that a fundamental miscarriage of justice w[ould] occur if the claim [wa]s not heard." Id. at 1081 (Dist. Ct. Docket No. 91 at 33).

### e) *Pavatt's challenge to the district court's procedural bar ruling*

Pavatt contends that "[t]he district court erred in finding this claim procedurally barred from federal review." Aplt. Br. at 41. In support, Pavatt asserts that "Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), gives the OCCA the option to permit consideration on the merits 'when an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.'" Id. (quoting Valdez, 46 P.3d at 710). "The merits inquiry," Pavatt asserts, "is thus part of the

36

default consideration, and therefore, lacks independence as in Ake v. Oklahoma, 470 U.S. 68, 74-75 (1985)." Id.

In Ake, "the OCCA held that [the defendant] had waived his claims that he was entitled to a court-appointed psychiatrist to assist him in an insanity defense because he had not renewed his request for a psychiatrist in a new-trial motion." Black v. Workman, 682 F.3d 880, 918 (10th Cir. 2012). "But under Oklahoma law there was no procedural bar if the alleged error was 'fundamental trial error'; and federal constitutional error was considered an error of that type." Id. (quoting Ake, 470 U.S. at 74–75). "Thus, the OCCA could not apply the waiver rule without first addressing the federal constitutional error." Id. "The Supreme Court concluded that the state waiver rule was therefore not an independent state ground for barring review." Id.

In Pavatt's case, the OCCA based its denial upon Oklahoma's Post-Conviction Procedure Act, Okla. Stat. tit. 22, § 1089(D)(8). That statute provides, in pertinent part, that "if a subsequent application for post-conviction relief is filed after filing an original application," the OCCA "may not consider the merits of or grant relief based on the subsequent . . . application unless" it "contains claims and issues that have not been and could not have been presented previously in a timely original application . . . because the legal basis for the claim was unavailable." Okla. Stat. tit. 22, § 1089(D)(8).

"Federal habeas courts generally refuse to hear claims 'defaulted . . . in state court pursuant to an independent and adequate state procedural rule.'" Johnson v. Lee, 136 S. Ct. 1802, 1803–04 (2016) (per curiam) (quoting Coleman v. Thompson, 501 U.S. 722,

37

750 (1991)). "State [procedural] rules count as 'adequate' if they are 'firmly established and regularly followed.'" Id. at 1804 (quoting Walker v. Martin, 562 U.S. 307, 316 (2011)).

We have repeatedly held that the Oklahoma statute that was relied on by the OCCA in this case—§ 1089(D)(8) of Oklahoma's Post-Conviction Procedure Act—"satisfies both adequacy criteria." Id. at 1804; see Williams v. Trammell, 782 F.3d 1184, 1212 (10th Cir. 2015) (holding "that the OCCA's ban on successive post-conviction applications is . . . a firmly established and consistently followed rule."); Thacker v. Workman, 678 F.3d 820, 835–36 (10th Cir. 2012) (same); Moore v. Reynolds, 153 F.3d 1086, 1097 (10th Cir. 1998) (same).

But Pavatt asserts, like some other Oklahoma capital defendants have in the past, that in light of Valdez, the exception makes the rule and the OCCA's reliance on § 1089(D)(8) "does not preclude merits review because the state bar is not independent of federal law." Fairchild v. Trammell, 784 F.3d 702, 719 (10th Cir. 2015). More specifically, Pavatt "is asserting that the OCCA will not impose a procedural bar [pursuant to § 1089(D)(8)] unless it first determines that any federal claims lack merit." Id.

We have held, however, "the Valdez exception only applies in cases involving an exceptional circumstance, and it is insufficient to overcome Oklahoma's regular and

38

consistent application of its procedural-bar rule in the vast majority of cases."[10]

Williams, 782 F.3d at 1213 (quotations and citations omitted). In this case, Pavatt's challenge to the HAC jury instruction is far from exceptional: it is a claim that was readily apparent from the trial record and that could and arguably should have been raised on direct appeal. Moreover, although the OCCA opined in a footnote that there was no merit to Pavatt's claim, the clear and unequivocal basis for its denial of his claim was procedural bar under § 1089(D)(8). See Cole v. Trammell, 755 F.3d 1142, 1158-59 (10th Cir. 2014) (acknowledging and applying the OCCA's procedural bar ruling, even though the OCCA, on an alternative basis, briefly addressed and rejected the merits of the petitioner's claim); Thacker, 678 F.3d at 834 n.5 (same). We therefore agree with the district court that Pavatt's challenge to the HAC instruction is procedurally barred.

*f) The merits of Pavatt's claim*

Even if we were to conclude that the claim is not procedurally barred, it cannot provide Pavatt with a valid basis for federal habeas relief. In Workman v. Mullin, 342 F.3d 1100 (10th Cir. 2003) and Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008), we considered HAC jury instructions identical to the one utilized in Pavatt's case and rejected claims identical to the one now asserted by Pavatt. In doing so, we concluded that the language of the instructions was sufficient to narrow the jury's discretion, as

---

[10] "Valdez was special because the lawyers there knew that their client was a citizen of Mexico and nonetheless failed to comply with the Vienna Convention when they failed to contact the Mexican Consulate, thereby depriving the Consulate [of] the ability to intervene and present its discovery that the defendant suffered from organic brain damage." Williams, 782 F.3d at 1213.

required by Supreme Court precedent. <u>Mullin</u>, 342 F.3d at 1116; <u>Wilson</u>, 536 F.3d at 1108.

*Ineffective assistance of trial and appellate counsel*

We granted a COA in our case management order on three distinct ineffective assistance of counsel claims. Pavatt addresses these claims in Proposition Three of his opening brief. First, he argues that his trial counsel was ineffective for failing to prevent the prosecution from presenting what he describes as pervasive victim-impact evidence in both stages of trial. Second, Pavatt contends that his trial counsel was also ineffective in failing to investigate and present a compelling mitigation case. Lastly, Pavatt contends that his counsel on direct appeal was ineffective for failing to assert these claims of ineffective assistance of trial counsel.

*a) Clearly established federal law applicable to the claims*

The clearly established federal law applicable to these claims is the Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687. "First," the Court noted, "the defendant must show that counsel's performance was deficient." <u>Id.</u> "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." <u>Id.</u> "Unless a defendant makes both

40

showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. In other words, "[t]o prevail on a Sixth Amendment claim of ineffective assistance of counsel under Strickland . . . , a defendant must show both that (1) counsel committed serious errors in light of prevailing professional norms such that his legal representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Grant v. Trammell, 727 F.3d 1006, 1017 (10th Cir. 2013) (quotations omitted).

The right to effective assistance of counsel extends to direct appeals, Evitts v. Lucey, 469 U.S. 387, 396–97 (1985), and the same standards apply in this context, see Smith v. Robbins, 528 U.S. 259, 285 (2000) (holding that "the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in Strickland"). This means that a defendant asserting a claim of ineffective assistance of appellate counsel "must show a reasonable probability that, but for his counsel's unreasonable failure to" raise a particular nonfrivolous issue, "he would have prevailed on his appeal." Id.

> *b) Trial counsel's failure to challenge the admission of testimony regarding Rob Andrew's religious beliefs and practice and his good, moral character, as well as photographs and a video-recording showing Rob Andrew while alive*

Pavatt complains that during the first-stage proceedings, the State, "[w]ithout objection from [his] defense counsel, . . . elicited from Rob Andrew's friends and family

41

detailed and glowing accounts of him as a husband, father, and friend." Aplt. Br. at 49.

As a result, Pavatt complains, "[t]he trial was saturated with descriptions of Rob

[Andrew] as a young, healthy, and successful professional who pursued active and

wholesome interests." Id. Pavatt also complains that "[t]he jury was repeatedly informed

regarding the extent of Rob[ Andrew]'s religious faith, including details of his Bible

study." Id. "This evidence," Pavatt asserts, "was designed to describe Rob [Andrew] in

especially devout terms and in marked contrast to Pavatt, who according to the

prosecution's theory, abandoned his Christian values to follow Brenda [Andrew] into the

sins of adultery and murder." Id. Finally, Pavatt complains that "[t]he verbal

descriptions of Rob [Andrew] were magnified by visual images," including "four

photographs of Rob in life and a video-recording of him with his brother and friends and

Pavatt during a hunting excursion during the winter prior to his death." Id.

Pavatt in turn argues that his "[t]rial counsel's failures to object to inadmissible

evidence continued in the punishment phase of the trial." Id. Specifically, he notes,

"[t]he prejudicial and improper evidence" that was admitted during the first-stage

proceedings "was incorporated into the sentencing stage without objection." Id. "This

emotion-driven evidence," Pavatt argues, "compounded by the victim-impact testimony

from Rob[ Andrew]'s father and brothers, presented much more than the quick glimpse

of the life of Rob Andrew that is constitutionally allowed." Id. at 49-50.

In his original application for state post-conviction relief, Pavatt asserted a host of

claims alleging ineffective assistance of trial and appellate counsel. Included was a claim

that his appellate counsel failed to challenge the admission of a pre-mortem studio photograph of Rob Andrew in a suit and tie (State's Exhibit 219), and that the admission of that photograph "rendered . . . Pavatt's trial fundamentally unfair, depriving him of the Due Process of Law, and unconstitutionally injected passion, prejudice, and other arbitrary factors into the sentencing proceeding." Original Appl. for Post-Conviction Relief at 54 (citations omitted). The OCCA concluded that this claim was "not accompanied by newly-discovered facts or new controlling case law" and was "therefore barred by *res judicata*." Pavatt II, No. PCD-2004-25 at 6. The OCCA also noted that it had rejected a similar claim in Marquez-Burrola v. State, 157 P.3d 749, 760 (Okla. Crim. App. 2007). Pavatt II, No. PCD-2004-25 at 6 n.6.

In his second application for post-conviction relief, Pavatt alleged that he was denied the effective assistance of trial, direct appeal, and post-conviction counsel. In support, Pavatt alleged, in pertinent part, that "[t]rial counsel objected to the admission of the video recording of the hunting trip,"[11] but "failed to object to the admission of the other live photographs of Rob Andrew and of Rob and Brenda Andrew together." Second Application for Post-Conviction Relief at 37-38. Pavatt further alleged "that trial counsel allowed multiple witnesses, who were friends and family of Rob Andrew, to

---

[11] The hunting trip video was relevant to show that Rob Andrew owned a 16-gauge shotgun and that Pavatt, who accompanied Rob Andrew on the trip, was familiar with and had actually used that particular shotgun. As the OCCA outlined in its description of the underlying facts, Rob Andrew was shot and killed with a 16-gauge shotgun, and the 16-gauge shotgun that Rob Andrew owned was found missing from Brenda Andrew's house after the murder.

43

testify to entirely irrelevant matters that could only raise sympathy in the minds of jurors." Id. at 38. Pavatt in turn alleged that "[d]irect appeal counsel and post-conviction counsel were ineffective in failing to raise this part of trial counsel's deficiencies." Id.

In its opinion denying Pavatt's second application for post-conviction relief, the OCCA noted that, under Oklahoma's Post-Conviction Procedure Act, its "consideration of successive applications for relief [wa]s even more limited than the review afforded to initial applications," and that it could "not consider the merits of any claim made in a subsequent application for post-conviction relief, unless (1) the legal basis for that claim was previously unavailable, or (2) the facts supporting the claim were not previously ascertainable through the exercise of reasonable diligence." Pavatt III, No. PCD-2009-777 at 2-3. Turning to Pavatt's claims of ineffective assistance of counsel, the OCCA noted that Pavatt "concede[d] that none of these claims [we]re based on newly-discovered evidence, or on any material change in the law." Id. at 7. As a result, the OCCA concluded it was "barred by the provisions of [Oklahoma's] Post-Conviction Procedure Act from considering these arguments and materials." Id. (citing Okla. Stat. tit. 22, § 1089(D)(8)).

The federal district court in this case considered on the merits only Pavatt's claim that his appellate counsel was ineffective for failing to challenge the admission of a pre-mortem photograph of Rob Andrew (State's Exhibit 219). With respect to that claim, the district court concluded that Pavatt had failed to demonstrate that the OCCA's decision was contrary to or an unreasonable application of Strickland. ROA, Vol. 3 at 1125 (Dist.

44

Ct. Docket No. 91 at 77). More specifically, the district court concluded it was "clear that based on the case cited by the OCCA in its denial of [Pavatt]'s claim, Marquez-Burrola, 157 P.3d at 759–61, as well as other cases decided by the OCCA prior to [Pavatt]'s appeal, . . . that [Pavatt] would not have prevailed on appeal had the claim been raised." Id. As for the remaining claims of ineffective assistance asserted by Pavatt, the district court concluded that they were either procedurally barred from federal habeas review, id. at 1146–47 (Dist. Ct. Docket No. 91 at 98-99) (addressing Pavatt's claim that his trial counsel was ineffective for failing to object to the admission of live photographs of Rob Andrew, other than State's Exhibit 219), or were inadequately presented by Pavatt in his habeas petition, id. at 1152-53 (Dist. Ct. Docket No. 91 at 104-05).

In this appeal, Pavatt argues that we should review his claims de novo for two reasons. First, he contends that "[t]he OCCA did not clearly impose a procedural bar of these claims, but instead stated the 'current arguments merely modify or expand the claims made, and rejected, in prior proceedings.'" Aplt. Br. at 50 (quoting Pavatt III, No. PCD-2009-777 at 4). As discussed above, however, and as Pavatt ultimately concedes in a related footnote, the OCCA quite clearly concluded that these claims were procedurally barred under Oklahoma's Post-Conviction Procedure Act. Id. at 50–51 n.14. And, as we have previously discussed, this procedural bar ruling is considered both independent and adequate and thus serves to preclude federal habeas review. See Johnson, 136 S. Ct. at 1803–04.

45

That leads to Pavatt's second argument: "[e]ven if this Court determines the OCCA imposed a procedural bar, such a bar is not without exception," and "[p]ost-conviction counsel's ineffectiveness in not fully challenging the failures of prior counsel to object to the inadmissible sympathy evidence is the 'cause' that excuses any default." Id. at 50-51. In other words, Pavatt argues that the ineffectiveness of his post-conviction counsel establishes the "cause" for his failure to comply with Oklahoma's procedural requirements. Pavatt contends that his position on this point is supported by Martinez v. Ryan, 566 U.S. 1 (2012), and Trevino v. Thaler, 569 U.S. 413 (2013).

In Martinez, the Supreme Court held that if

> under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

566 U.S. at 17. In Trevino, the Supreme Court explained that, in determining whether Martinez applies in a particular case, four requirements must be met:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceedings was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.

569 U.S. at 423 (alterations and emphasis in original) (quoting Martinez, 566 U.S. at 13–18). And the Court in Trevino ultimately extended the rule in Martinez to circumstances in which state law does not expressly require claims of ineffective assistance of trial

46

counsel to be brought in collateral proceedings, but, by way of its "structure and design . . . make[s] it virtually impossible for an ineffective assistance claim to be presented on direct review." Id. at 417 (quotations omitted).

Pavatt argues that the rule outlined in Martinez and Trevino should be applied in his case because (a) he was represented at trial and on direct appeal by the same attorney, (b) consequently, his initial application for state post-conviction relief was his first real opportunity to assert ineffective assistance of trial counsel claims, and (c) his post-conviction counsel was ineffective for failing to raise these claims of ineffective assistance of trial counsel and appellate counsel.[12]

Martinez and Trevino are distinguishable from Pavatt's case, however, because in both of those cases, the Supreme Court focused on whether the "structure and design" of the state system at issue actually or effectively prevented the petitioner from raising his or her ineffective assistance claim for the first time until state post-conviction proceedings. We are not persuaded that the same holds true with respect to Oklahoma's system and Pavatt does not argue otherwise.[13]  Indeed, Pavatt's argument is based exclusively on his own unique circumstances, i.e., the fact that he was represented at trial and on appeal by

---

[12] Attorney Michael Arnett represented Pavatt both at trial and on direct appeal. On direct appeal, Pavatt was also represented by another attorney, Gloyd McCoy.

[13] Oklahoma law generally requires that a claim of ineffective assistance of trial counsel be raised on direct appeal.  See Cole, 755 F.3d at 1159.  But we do not treat this procedural bar rule as "adequate" if the petitioner was represented by the same counsel at trial and on direct appeal.  Id.

47

the same attorney. Thus, Pavatt has not established an exception to the procedural bar rule that would otherwise apply to his ineffective assistance of trial counsel claims.

Pavatt also, as previously noted, asserts in this appeal that his appellate counsel was ineffective for failing to raise these ineffective assistance of trial counsel claims on direct appeal. The OCCA rejected these ineffective assistance of appellate counsel claims as procedurally barred under Oklahoma's Post-Conviction Procedure Act. Because the OCCA treated these claims as procedurally barred, and because Martinez and Trevino do not apply to ineffective assistance of appellate counsel claims, we conclude that those claims are also barred from federal habeas review.

*c) Trial counsel's failure to investigate and present a compelling mitigation case*

Pavatt also complains that his trial counsel failed to investigate and present sufficient mitigating evidence during the second-stage proceedings. Pavatt argues that trial "[c]ounsel's meager presentation of mitigation, based on a last-minute and superficial investigation, was an afterthought." Aplt. Br. at 65. According to Pavatt, his trial counsel, "believing [Pavatt] would be acquitted, put his time and resources into the guilt/innocence stage of trial" and "operated under the unreasonable belief that residual doubt of Pavatt's guilt would be enough to persuade jurors to spare his life." Id. Pavatt argues that his "[t]rial counsel had no reasonable strategy to shun the thorough investigation that would have uncovered Pavatt's significant psychological impairments and explained how those impairments, and his unique background, caused him to be easily influenced by Brenda Andrew." Id. at 65–66.

48

Pavatt first raised this claim in his second application for state post-conviction relief. The OCCA concluded that, because the claim was not "based on newly-discovered evidence . . . or on any material change in the law," it was "barred by the provisions of [Oklahoma's] Post-Conviction Procedure Act from considering" this claim. Pavatt III, No. PCD-2009-777 at 7.

For the same reasons discussed above, we conclude that the OCCA's procedural bar ruling precludes federal habeas review of this ineffective assistance of trial counsel claim, and that Pavatt has failed to satisfy the requirements outlined in Martinez and Trevino in order to establish an exception to this procedural bar rule.

*d) Ineffective assistance of appellate counsel*

Finally, Pavatt contends that his appellate counsel was ineffective for failing to "raise the claims of trial counsel's ineffectiveness" outlined above. Aplt. Br. at 99. This claim, like his ineffective assistance of trial counsel claims, is procedurally barred due to Pavatt's failure to raise the claim in his original application for state post-conviction relief. Further, this claim of ineffective assistance of appellate counsel does not fall within the Martinez/Trevino exception.

## III

We VACATE the prior panel opinion, AFFIRM the judgment of the district court, and DENY Pavatt's request for an additional COA.

14-6117, *Pavatt v. Carpenter*
**HARTZ,** Circuit Judge, dissenting, joined by **KELLY**, J. and **LUCERO**, J.
Circuit Judges.

I respectfully dissent.

In *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988), the Supreme Court held that Oklahoma's statutory HAC aggravator was too vague to satisfy the Eighth Amendment absent a limiting construction from the state courts, because under the statutory language there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." In response, the Oklahoma Court of Criminal Appeals (OCCA) construed the statutory aggravator to require that one of several alternatives must be satisfied. One of those alternatives was that the victim experienced conscious physical suffering. *See Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995) ("Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met.")

This court upheld the constitutionality of the aggravator in *Hatch v. Oklahoma*, 58 F.3d 1447, 1468–69 (10th Cir. 1995). Early on, the OCCA sent some signals that the necessary conscious physical suffering must be more than merely the natural consequence of being murdered. *See Cudjo v. State*, 925 P.2d 895, 901–02 (Okla. Crim. App. 1996) ("[T]he manner of [the victim's] killing did not involve any acts of injury or cruelty beyond the scope of the act of killing itself."); *Cheney*, 909 P.2d at 80 ("The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing."); *Booker v. State*, 851 P.2d 544, 548 (Okla. Crim. App. 1993) ("The record does not support a finding of mental anguish beyond that which necessarily

accompanied the underlying killing.").  Since then, however, several members of this court have expressed concern that the aggravator is being interpreted by the OCCA too broadly to satisfy the Eighth Amendment.  *See Romano v. Gibson*, 239 F.3d 1156, 1176 (10th Cir. 2001); *Thomas v. Gibson*, 218 F.3d 1213, 1228 n.17 (10th Cir. 2000); *Medlock v. Ward*, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring).  I now agree that the Oklahoma HAC aggravator, as presently construed by the OCCA, does not satisfy the Eighth Amendment requirement that the aggravator distinguish in a principled way those first-degree murderers who deserve the death penalty from the many who do not.

At oral argument before the en banc court, counsel for the State acknowledged what is apparent from the OCCA opinion in this case:  a defendant "qualifies for the [HAC] aggravator if the victim was conscious for some period of time (a couple minutes) after receiving the fatal blow and experienced some pain during that time."  Oral argument at 39:20–38.  In other words, the very act of committing the murder makes one eligible for the death penalty unless the victim was rendered unconscious immediately upon receiving the fatal blow.  In my view, no fairminded jurist could think that this requirement distinguishes in a *principled* manner those deserving the death penalty from the many first-degree murderers who do not.  To the extent that it is not merely fortuitous that the victim remains conscious, this test provides what could be described as a "sharpshooter bonus."  If the perpetrator has the skill to render an immediately fatal blow, he or she escapes the death penalty under this aggravator.  Such an arbitrary aggravator is not consistent with the Supreme Court's "narrowing jurisprudence, which seeks to ensure

2

that only the most deserving of execution are put to death." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

The majority opinion does not address this issue. It holds that Mr. Pavatt did not exhaust in state court his Eighth Amendment challenge to the HAC aggravator and therefore he is procedurally barred from raising it here. I respectfully disagree. It is not clear to me that it was not exhausted. But in any event, the State waived the exhaustion defense.

The majority of the panel that heard this case understood Mr. Pavatt's briefs in this court as arguing that the OCCA, in affirming his sentence, had construed the HAC aggravator in a way that violated the Eighth Amendment. As pointed out in the original panel opinion, *Pavatt v. Royal*, 859 F.3d 920, 935 (10th Cir. 2017), Mr. Pavatt's original appellate briefs raised this issue in three places. Page 21 of the opening brief said: "[T]he evidence here—as related to the core element of conscious suffering—is constitutionally insufficient." The argument on pages 35–36 was more developed:

> The Eighth and Fourteenth Amendments require that an aggravator serve a narrowing function rather than become a standardless catch-all. *Arave v. Creech,* 507 U.S. 463, 474 (1993) and *Godfrey v. Georgia*, 446 U.S. 420, 428–29 (1980). Oklahoma has veered off the course forced on it by *Cartwright*, coming full circle and no longer limiting this clearly vague aggravating circumstance in a manner that minimizes "the risk of wholly arbitrary and capricious action." *Maynard*, 486 U.S. at 362–63.

And the reply brief at 5 challenged "whether there was sufficient evidence to support a constitutional reading and application of the [HAC] aggravator." Yet, as noted in the original panel opinion:

3

> Although the State has argued procedural bar with respect to several of Mr. Pavatt's claims, it did not argue in its appellate brief that the sufficiency-of-the-evidence claim or any of its components was procedurally barred, nor did it argue procedural bar when questioned at oral argument about the insufficient-narrowing component of that claim.

859 F.3d at 936 n.4.

The failure of the State's original appellate briefing to raise exhaustion should not be surprising because in federal district court the State had explicitly conceded exhaustion. Its brief in response to the § 2254 application said that Mr. Pavatt's Ground Ten had been "exhausted for purposes of federal habeas review." Resp. to Pet. for Writ of Habeas Corpus, *Pavatt v. Workman*, No. Civ-08-470-R (D. Okla. Jul. 31, 2009), ECF No. 69 at 128. The majority opinion says that the State was conceding exhaustion of only a *Jackson* challenge to the sufficiency of the evidence. *See* En Banc. Op. at 30; *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). But the State brief's 10-page discussion of Ground Ten clearly indicates otherwise. It included substantial references to the Eighth Amendment constraints on aggravators. For example, one paragraph begins: "To be constitutional, an aggravating circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. It must not also be unconstitutionally vague." Resp. to Pet. for Writ of Habeas Corpus at 135. The paragraph ends: "Nothing about the OCCA's discussion of the legal or factual basis for its conclusion here in any way suggests an overbroad or an erroneous interpretation, let alone application, of Oklahoma's [HAC] aggravator." *Id*. at 136. In discussing the Eighth Amendment, the State's brief included nary a hint that its acknowledgment of exhaustion of Mr. Pavatt's Ground Ten did not encompass this component of the issue.

4

Further, even after the panel dissent argued that Mr. Pavatt's Eighth Amendment claim had not been exhausted, the State was at best halfhearted in arguing in its original petition for rehearing that it had not waived exhaustion. It wrote: "It is debatable whether Respondent waived an exhaustion defense by asserting in district court that Petitioner's sufficiency claim is exhausted." Pet. for Panel Reh'g or Reh'g En Banc at 5 n.1. This sentence is followed by a "compare" citation that notes one published opinion in which we held that exhaustion was not waived and one unpublished case in which we held that exhaustion was waived. There is no real argument on the issue. Moreover, the perfunctory statement is only in a footnote, which under this court's precedent is not adequate to preserve an issue. *See United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) (en banc) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.")

Perhaps the State thought that Mr. Pavatt had a good argument for exhaustion.[1] But the State may also have had strategic reasons for waiving exhaustion. The HAC

---

[1] Mr. Pavatt clearly raised an Eighth Amendment claim in his second application to the OCCA for postconviction relief. A fair construction of that argument is that the OCCA decision in his case demonstrated that the OCCA had expanded the meaning of "conscious physical suffering" so broadly that the requirements of *Maynard* were no longer satisfied. This strikes me as an appropriate argument under the Eighth Amendment. To determine how a state court construes an aggravating circumstance, we can examine that court's opinions. *See Arave*, 507 U.S. at 477. The opinions we examine can include the opinion rendered in the very case before us. If we could not consider that opinion in determining whether the state courts have improperly expanded the meaning of the state aggravator, then state courts would have one "freebie" that is immune from Eighth Amendment review.

The OCCA rejected the claim in the second application on the ground that it was waived because the "legal argument could have been raised in prior proceedings, but was

5

not." Op. Den. Second Appl. at 6. But the only authority cited in support was Okla. Stat. tit. 22, § 1089(D)(8) (2019), which did not apply. That statutory provision permits review of "claims and issues that have not been and could not have been presented previously in a timely original application or in a previously considered application filed under this section, because the legal basis for the claim was unavailable, or . . . because the factual basis for the claim was unavailable as it was not ascertainable through the exercise of reasonable diligence on or before that date." And Mr. Pavatt could not have argued in his original postconviction application that the OCCA opinion in his case construed the HAC aggravator in an unconstitutional manner, because he filed the original application before the OCCA decided his direct appeal.

At the en banc oral argument, counsel for the State asserted that the issue was barred from consideration in the second postconviction application because it could have been raised in a petition for rehearing in the direct appeal. Counsel was apparently relying on Okla. Stat. tit. 22, § 1089(C) (2019), which states that the only issues that can be raised in an application for postconviction relief are those that "[w]ere not and could not have been raised in a direct appeal." But it is not at all clear that a petition for rehearing would have been a proper way to raise a claim that the OCCA opinion on appeal adopted an unconstitutional interpretation of the HAC aggravator. OCCA Rule 3.14 provides, in relevant part: "A petition for rehearing shall not be filed, as a matter of course, but only for the following reasons: (1) Some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or (2) The decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument." Apparently, the OCCA has interpreted the second alternative as limited to issues raised in the brief in chief or at oral argument. *See White v. State*, 900 P.2d 982, 995–96 (Okla. Crim. App. 1995) (petition for rehearing did not satisfy the rule because "the decision upon which [defendant] relies is not controlling of the issues presented in his brief-in-chief."). Thus, in *Ellis v. State*, 941 P.2d 527, 530 (Okla. Crim. App. 1997), the court said that the defendant "clearly could not raise a *new* issue in a petition for rehearing." In keeping with this interpretation of the rehearing rule, on at least two occasions the OCCA on postconviction review has heard constitutional challenges to the way that the OCCA had addressed issues on direct appeal, even though the challenges had not been raised in petitions for rehearing. *See Cannon v. State*, 933 P.2d 926, 929 (Okla. Crim. App. 1997) (The defendant argued that "his constitutional rights were violated when this Court held that reversing his rape and sodomy convictions did not require reversal or modification of his murder conviction or death sentence."); *Nguyen v. State*, 844 P.2d 176, 180–81 (Okla. Crim. App. 1992) (The defendant argued that the OCCA violated his constitutional rights when it upheld his death sentence even after determining that there was insufficient evidence to support the HAC aggravator.) A member of this court has also expressed this

6

aggravator is a commonplace in Oklahoma death-penalty cases. If new challenges to the

aggravator are going to be made, it may be advantageous to deal with them sooner rather

than later. A successful challenge years down the road could be extremely disruptive. If

the State believes that the defendant is even more unsympathetic than usual and that the

---

view of Oklahoma procedure. In his dissent in *Bear v. Boone*, 173 F.3d 782, 783–84 (10th Cir. 1999), Judge Ebel contended that the defendant could properly raise in a postconviction application a claim that the OCCA on direct appeal had unconstitutionally assumed the rule of a jury in modifying his conviction to that of a lesser-included offense. He wrote: "[T]he first opportunity [the defendant] had to raise his due process challenge to the modification of his crime of conviction arose after the Court of Criminal Appeals issued its opinion. Because I believe it would have been inappropriate for [the defendant] to raise his due process claim under the limited rehearing procedures set out in Oklahoma Court of Criminal Appeals Rule 3.14, I believe [the defendant] can now present his due process claim by way of an application for postconviction relief in the Oklahoma courts." *Id.* at 786. The panel majority in *Bear* did not address the issue.

In short, the second application to the OCCA for postconviction relief was the first occasion on which Mr. Pavatt could have raised his claim that the decision by the OCCA on direct appeal established that the court had adopted an unconstitutional construction of the HAC aggravator. The OCCA's procedural bar of the claim on the ground that it "could have been raised in prior proceedings, but was not," Op. Den. Second Appl. at 6, appears to be unsupported by the relevant rule and statute as interpreted in state-court precedent. For a state procedural bar to bind a federal court, it must rest on "independent and adequate" state-law grounds. *Walker v. Martin*, 562 U.S. 307, 316 (2011). "To qualify as an adequate procedural ground, a state rule must be firmly established and regularly followed." *Id.* (internal quotation marks omitted); *see Johnson v. Mississippi*, 486 U.S. 578, 587–89 (1988). One may therefore question the adequacy of the OCCA's procedural bar of Mr. Pavatt's Eighth Amendment issue in the second application. Unfortunately, this issue has not been developed in this court because exhaustion was raised at such a late stage.

present composition of the courts is favorable, it may welcome an early challenge even if there is a respectable exhaustion argument.  There is nothing wrong with that approach.  It would be wrong, however, to waive exhaustion and then, after losing on the merits, argue that it is so plain that the prisoner failed to exhaust remedies that the State cannot possibly have meant what it said when it conceded exhaustion.

I continue to believe that the State waived its exhaustion argument, and I think there is a reasonable argument that Mr. Pavatt exhausted his Eighth Amendment claim in state court and was procedurally barred on an inadequate state ground.  I would therefore address the merits of the Eighth Amendment issue and hold that no reasonable jurist could say that the OCCA's interpretation of the HAC aggravator satisfies Eighth Amendment standards set by the Supreme Court.